HARRIET L. KNOWLTON *vs.* FRANK B. ROSS, et al.

York.   Opinion September 7, 1915.

*Damages.     Duress.     False Imprisonment.     Misconduct of Counsel.*
*Practice.     Restraint.     Trover.     Waiver.*

1.  Misconduct of an attorney in argument to the jury must be objected to at the time, or it is waived.
2.  To constitute false imprisonment there must be actual, physical restraint. Threats to imprison are not imprisonment.
3.  The evidence. does not warrant the conclusion that the plaintiff's liberty was restrained by the defendants.
4.  Threats of unlawful arrest do not constitute duress, unless there is reasonable ground for apprehension of immediate or impending danger of arrest.
5.  An act done, or contract made, under duress is voidable, not void.   If a person, who has been constrained by duress to do an act, afterwards voluntarily acts upon it, or in any way affirms its validity, it is a ratification, and he is precluded from avoiding it.

On motion by defendant for a new trial.   Motion for a new trial sustained.

This is an action for false imprisonment of plaintiff by the defendant.   There is also a count for trover.   The jury returned a verdict for the plaintiff, and the defendant filed a motion for a new trial.

The case is stated in the opinion.

*Cleaves, Waterhouse & Emery,* for plaintiff.

*John A. Snow and E. P. Spinney,* for defendants.

SITTING:  SAVAGE, C. J., SPEAR, KING, BIRD, HANSON, JJ.

SAVAGE, C. J.  This is a suit for false imprisonment, with a count for trover.  The verdict was for the plaintiff, and the case comes before us on the defendan't motion for a new trial.

The plaintiff claims that she was restrained of her liberty by the defendants under circumstances constituting false imprisonment, until by means of the duress of such imprisonment she delivered to them a valuable diamond ring in pledge as security for the payment of a bill owed by her husband to one of them, and of another bill claimed to be owed by another person.  The count in trover is for the conversion of the ring.

We first notice a question of practice.  The parties were in controversy as to the value of the ring, which was material on the question of damages, if the plaintiff was entitled to recover.  One of the reasons alleged in the motion for a new trial is the misconduct of plaintiff's attorney in his closing argument to the jury, in that he said "that the plaintiff stood ready to credit the sum of $800 on any verdict that the jury might return for the plaintiff, if the defendants would deliver to the plaintiff said ring."  It is obvious that such language could not be other than prejudicial, since it would tend to remove from the jurors' minds any sense of responsibility for the amount of damages up to $800, which they might assess for the conversion of the ring.  The attorney complained of testified that he said to the jury only that he had no doubt the plaintiff would gladly allow $800 upon any verdict which might be rendered if the ring was returned.  Even in that form, the argument is not to be commended.  But at the time of the argument defendants' counsel made no protest or objection.  And that is fatal to his present contention.  The rule is well settled.  If counsel in addressing the jury exceed the limits of legitimate argument, it is the duty of opposing counsel to object at the time, so that the presiding Justice may set the matter right, and instruct the jury with reference thereto.  If the Justice neglects or declines, after objection, to interfere, redress may be sought by a bill of exceptions.  *Rolfe*₁ v. *Rumford,* 66 Maine, 564.  If the offending counsel, after being required to desist or retract refuses to do so, the remedy is by a motion for a new trial.  *Powers* v. *Mitchell,* 77 Maine, 361.  So, if the remarks are of such a character that even the intervention of the Justice is not deemed to have removed the prejudice and cured the evil, the

remedy is by motion. *Sherman* v. *M. C. R. R.,* 86 Maine, 422 ; *State* v. *Martel,* 103 Maine, 63. But in any event, objection must be made at the time; if not so taken, it is considered as waived. *State* v. *Watson,* 63 Maine, 128 ; *Powers* v. *Mitchell,* supra.

But we think the motion must be sustained upon another ground, namely, that it is manifestly against the evidence. The evidence is sharply conflicting, but after a careful analysis of it, we think that so much of it as the plaintiff relies upon, and which the jury might properly have found to be true, does not sustain the verdict.

It appears that the plaintiff's family, that is, her husband, herself, and their two daughters had been guests for several years at the summer hotel of Mr. Jacobs, one of the defendants, at Ogunquit. The bills for 1907 and 1908 had not been paid. In July, 1909, the family spent two days at the hotel. They had with them a friend, Mr. Lynch. The bills for all were charged to and paid by Mr. Knowlton, the plaintiff's husband. The plaintiff claims that at that time some talk was made about coming back later in the season, and that Mr. Jacobs showed them some rooms in a cottage of which he had the use, and told them that they could have them for $100 a week for all five, the four Knowltons and Lynch. This is denied by the defendants. In August, the plaintiff telephoned the management of the hotel for rooms, and the great weight of the evidence shows, we think, that she was told that they had no rooms available for them. Notwithstanding this, on the next day, August 17, the family and Mr. Lynch appeared, and after some colloquy, were assigned to the cottage, but not to the rooms which the plaintiff says Mr. Jacobs had shown to them in July. From all this, the plaintiff contends that Lynch was the guest of the family, and was so understood to be by Mr. Jacobs, and that for that reason, Lynch's board was included in the $100 a week which was to be charged for the family. But Mr. Jacobs, denying that there was any arrangement made in July for the family or Lynch, charged Lynch $20 a week for his board, and charged Mr. Knowlton $100 a week for the board of himself, wife and daughters. Mr. Jacobs also claims that owing to the failure of Knowlton to pay in 1907 and 1908, he declined to receive the family as guests until Mrs. Knowlton had promised to be personally responsible for the bill. This she denies. At the end of two weeks Knowlton gave the bookkeeper a draft

for $225, payable September 16, which was credited on his account. All the foregoing is material only as it tends to throw light on what happened on September 6.

On that day, Mr. Jacobs placed the bill against Knowlton and the one against Lynch in the hands of the defendant Ross for collection. Capias writs were made against these two on the strength of the oath of Jacobs that they were "about to depart and reside beyond the limits of the state, etc." It was later learned that Knowlton had gone to Boston. But Lynch was still at the hotel. Ross with a deputy sheriff went into a room and Lynch was sent for. When he came in he was shown the writ against himself, and informed that he must pay, give bond or go to jail. He protested that he was there only as a guest of the Knowltons, and therefore that the indebtedness was not his. At Lynch's request, the plaintiff was sent for to explain the matter. She came. And she too protested that the indebtedness was not Lynch's, but that it was her husband's. During the interview the writ against Knowlton was produced and shown to the plaintiff. In the account annexed no credit was given for the draft which the bookkeeper had received, as Jacobs claims, without authority.

So far, there is no material disagreement. But as to the other details of the interview, the parties are wholly at variance. The plaintiff claims that when she went into the room the doors were closed, and as she thinks locked. At the same time she says that the deputy sheriff and the hotel manager placed themselves so as to be apparently guarding the exits from the room. She says that Ross said to her, "You people can't came to the State of Maine and get your board here at a hotel and leave without paying the bill." "You know it is a state's prison offence to come into a state and leave without paying;" that he said also, "You don't want to go to jail. You don't want to disgrace yourself and your daughters to go," and that she replied, "Well, we will go to jail." She says that Lynch then said, "You know what it means; it means for us all to go to jail." She claims that she was asked by Ross if she had any property that she could give as security for the claims; that she showed him the diamond ring, which he took and examined, and put in his pocket, and that "they decided to keep it until the bill was paid;" and that they then told her she might go.

On the other hand, the defendants claim that the doors were neither locked nor guarded, that there was no talk about any state's prison or jail offense, or about anybody's going to jail, except what was said to Lynch; that Lynch besought the plaintiff to "fix it up," and save him from going to jail; that it was arranged that she would take care of that bill; that in the same connection, she mentioned the "family" bill, admitted that she had agreed to be responsible for that, and arranged to "fix" that up at the same time she "fixed" the Lynch bill. And as security for the payment of both bills, it is contended, she voluntarily put the ring in question into the possession of Ross. Whatever may have been said or done, it is entirely clear that as the result of the interview the plaintiff left the ring in Ross's possession with the understanding, and with her assent, unless void by reason of dures, that it should be held by him as security for the payment of both claims. For the plaintiff herself has testified with respect to the $225 draft which had been received by the bookkeeper, that she "asked Mr. Ross for it after he had taken the ring and we were out of the room and they had accepted the ring as a settlement from Mr. Knowlton." And further she says, "I said, 'As long as you have my ring which more than covers the bill, the draft is no good and I will take it.' He at first refused to give it to me, and I said 'I insist on having it,' and he gave it to me. I took it and kept it."

We think, in the first place, that the evidence does not warrant the conclusion that there was any imprisonment of the plaintiff. She was present in the room at the request of Lynch, and not of the defendants. There was a writ against Lynch, and one against her husband, but none against her. She was not touched. She was not told she could not leave the room. The doors were closed, as would be natural under the circumstances. There is no credible evidence that they were locked. There was nothing to prevent her leaving the room had she chosen to do so. She says the defendants made a show of guarding the exits from the room, that the officer walked back and forth, and that the manager stood for awhile at one door. It must be remembered that the plaintiff was not there at the defendants' solicitation, that apparently they had had no purpose of pursuing her that day, that they had no process against her, but that Lynch was practically under arrest. Under these cir-

cumstances, the fact that the officer walked back and forth has no significance that she too was restrained of her liberty. And the fact, if it was a fact, that the manager stood at the door would be vastly more significant of a purpose of preventing instrusion by others, than of preventing the going out of the plaintiff. The room was a public room to which the guests of the hotel and the servants ordinarly had access. And the presence of outsiders could not have been desired by any of the parties. There was nothing in the conduct of the officer or of the manager, we think, to justify the belief of the plaintiff that she was, as she terms it, "under arrest." If there were threats, as she claims, they did not constitute imprisonment. They would be evidence of an intention to imprison at some future time. To constitute false imprisonment there must be actual, physical restraint. *Whittaker* v. *Sanford,* 110 Maine, 77.

The question of false imprisonment thus eliminated, there is no basis for a recovery by the plaintiff on any ground. We have seen that she did not deliver the ring to the defendants under duress of false imprisonment, for there was none. Nor was there duress per minas. It is true that threats of unlawful arrest, accompanied with such circumstances as would indicate a prompt or immediate execution of the threats, if the will is thereby overcome, constitute duress. It is true also that the arrest of a married woman for debt would be unlawful. But it is doubtful if the language used, taking the plaintiff's own version of it, can properly be construed as threats. Even if so, there was no reasonable ground for apprehension of immediate or impending danger, which is essential. *Harmon* v. *Harmon,* 61 Maine, 227; *Higgins* v. *Brown.* 78 Maine, 473; 9 Cyc., 446. There was no allusion to any precept issued or to be issued against the plaintiff. On the contrary, precepts covering the entire claims had been issued against others, and the plaintiff knew it. Giving the language as related by the plaintiff, the defendants held out to her only a suggestion of what danger might befall her in the indefinite future. That is not duress.

But were it otherwise, the plaintiff's case is not sustainable. A contract made, or act done, under duress is voidable, not void. If a person having been constrained by duress to do any act afterward voluntarily acts upon it, or in any way affirms its validity, he precludes himself from then avoiding it. 9 Cyc., 443. It appears from

the plaintiff's own statement that after she had left the room and after the alleged duress was ended, she demanded, insisted upon, and received the surrender of the draft which her husband had given in payment of a part of the bill against him, and she did so on the ground that the defendants held the ring as security for the bill. This was entirely voluntary on her part. It was a recognition of the validity of the pledge. If the pledging had been before that time voidable, her act was a ratification of it. She could not demand, receive and retain the draft, and at the same time be permitted to deny the validity of the pledge.

*Motion for a new trial sustained.*